[Crim. No. 3614. Fifth Dist. July 25, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD GENE GOSS, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Ezra Hendon, Chief Assistant State Public Defender, Richard E. Shapiro and Roy K. Simmons, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Gregory W. Baugher and Paul H. Dobson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HAMLIN, J.*—

STATEMENT OF THE CASE

Appellant stands convicted, following a jury trial, of attempted burglary (Pen. Code, §§ 663, 459). He was placed on probation for 2 years; as a condition of probation he was ordered to serve 300 days in the county jail and to make restitution in the amount of $150. He has appealed the conviction, contending that the trial court erred by failing to suppress evidence of statements appellant made to law enforcement officers. Appellant argues that evidence of both his statements to sheriff's officers was inadmissible under *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], because a tape recording of one of the statements was erased by a secretary at the sheriff's department. Appellant also contends the court erred by requiring him to make restitution in the amount of $150 as a condition of probation.

THE FACTS

On the night of June 11-12, 1977, as Mr. Robert Swanberg was preparing to go to bed in his Visalia home, he heard something which sounded like the prying apart of wood. A few minutes later, Swanberg went outside to investigate. He followed the sound to one of the new, unoccupied houses in the subdivision where Swanberg saw two figures near the back of the new house. He told the people to halt, flashing his light on them. When they started to run, Swanberg fired a warning shot. The intruders continued running, but Swanberg was able to grab appellant Goss.

Swanberg told appellant to get down on the ground. Appellant asked if Swanberg was "the law," to which Swanberg replied he was a concerned neighbor. Appellant regurgitated and said he was so sick he didn't care if he was shot. He again attempted to flee, but Swanberg apprehended him in an open field. Swanberg detained appellant until officers from the sheriff's department arrived at about 1 a.m. (Swanberg's wife, having heard the commotion, called for help).

Sheriff's Officer Dale Hardin responded to the call. Appellant was taken into custody and Hardin investigated the area for evidence. He

---

*Assigned by the Chairperson of the Judicial Council.

found an L-shaped tire iron near the unoccupied residence where Swanberg first observed appellant and the other person. Officer Hardin noted pry-marks on a window of the house and the sliding glass door had been pried open approximately 18 inches.

Appellant waived his *Miranda* rights and spoke with officers at the scene. Detective Alfred Richmond asked appellant why he had gone to the house in question. Appellant said he had been driving an automobile with a man named "Kenny"[1] and that the car had run out of gas. He claimed that he and Kenny had walked to the residence to get some gasoline. Appellant explained that he went to the back door of the residence, and then he and Kenny started to run when a man began shooting at them.

An older model Pontiac was discovered about one-half mile from the house where appellant was found. There were several other obviously occupied houses between the car and the house in question. It was later determined that the Pontiac belonged to a friend, who had loaned the car to appellant that evening. A tire changing tool was missing from the car when the friend retrieved the car from the towing service which had towed it from the scene.

Murry Jackson towed the Pontiac from the location at which it was parked to his towing establishment during the early morning hours of June 12th. In looking through the vehicle, he found a wallet containing appellant's identification under the front seat. The car started right away after having been towed and the gas gauge registered one-quarter tank. The owner testified the gas gauge was not accurate, but the car did run from the towing service to a nearby gas station when reclaimed.

After appellant was taken to the sheriff's department, he again waived his *Miranda* rights and spoke with Detective Richard Logan. Logan testified that appellant made the following statement to him. Appellant borrowed a friend's car on the night in question because his own car was not operating, and he was using the friend's vehicle to transport a battery to his car. He claimed to have met "Kenny" at a Kwik Stop Market and solicited his help in driving one of the two cars after the battery was installed. While they were in the friend's car, Kenny told appellant to drive into a residential area. Appellant advised Kenny that they were getting low on gas and Kenny directed him down a road

---

[1]Appellant claimed not to know Kenny's last name and said he had just met Kenny that night.

which Kenny thought would lead to a gas station. Appellant stated that they then ran out of gas and that they proceeded to walk toward where they believed the gas station was located.

Logan further testified that appellant told him Kenny suggested they "rip off" a microwave oven from one of the unoccupied houses in the subdivision through which they were walking. Kenny showed appellant another house where he said he had "ripped off" a microwave oven the night before.[2] Kenny told appellant to go around to the back of the target house, which he did.

Officer Logan testified that after he obtained the foregoing statement from appellant (which was not recorded) he then decided to tape record a statement from appellant. He did so, played the tape back and heard the statement. He later turned the tape over to a sheriff's department secretary for transcribing. Some time shortly thereafter, Logan replayed the tape and discovered that nothing could be heard on it.

On cross-examination of Officer Logan, defense counsel read from the report Officer Logan had originally prepared after taking the first unrecorded statement from appellant. The original report didn't mention the portion of appellant's statement referring to burglarizing a house to "rip off" a microwave oven. That first report simply stated that appellant and Kenny went into the subdivision looking for a gas station and that appellant walked to the back of an unoccupied house, where he saw a man who started chasing him with a gun.

Officer Logan prepared a supplemental report after he discovered that the tape-recorded statement had been erased. The supplemental report, set forth in part in the margin,[3] included incriminating remarks by appellant about the plan to burglarize the unoccupied house and take a microwave oven.

---

[2] The vice president of the real estate company which owned the unoccupied houses in the subdivision testified that a residence in the development had been burglarized and a microwave oven had been taken from it on June 10, 1977.

[3] The following is a quote from the supplemental report: "R.O. (reporting officer) after reviewing report written on 6-13-77, noticed that I had left out part of the conversation between R.O. and suspect Goss. R.O. is writing this supplemental report to cover the conversation between R.O. and Goss.

"Goss advised R.O. that after running out of gas and walking over to the housing development, that Kenny told Goss how he, Kenny, had ripped off a house the night before and took a microwave oven. Goss advised R.O. that Kenny showed him which house he broke into and that he also had ripped off other houses in the area. Goss stated he was then told by Kenny that he was planning to rip off another house with Goss'

Appellant testified on his own behalf and denied attempting to commit a burglary. He also denied using a tire iron. In addition he offered an explanation for being in the subdivision with Kenny and for running from Swanberg.

Appellant denied admitting to Officer Logan that Kenny mentioned his plan to break into the house. He claimed that the incriminating admissions in the supplemental police report prepared by Officer Logan were untrue. He had no idea who caused the damage to the house.

An evidentiary hearing was held in connection with appellant's motion to suppress testimony of Officer Logan as to his statements pursuant to *People* v. *Hitch, supra,* 12 Cal.3d 641. Detective Richard Logan testified concerning the two reports he prepared and the two statements he took from appellant. Logan said that Sergeant Henry Babcock was present when the first statement was taken; Logan was alone with appellant when the second statement was taken. Logan testified that the second statement (which was tape recorded) was taken right after the first statement (which was not). Logan said the two statements were "substantially the same." Two days after taping appellant's statement, Logan took the tape to Cheryl Porter, the detective secretary, for transcribing. While Logan was giving the tape to Ms. Porter, he noticed another detective bring four or five tapes to her. The other detective deposited his tapes on Ms. Porter's desk and asked her to erase them. Detective Logan returned to his office, and about five minutes later, Ms. Porter came in to tell him she thought she had erased the tape of appellant's statement. Logan discovered the tape had been erased before transcribing.[4]

Logan testified as to the office procedures for handling such tapes. He also testified he followed that procedure with the tape of appellant's statement.

---

help and steal another oven. Goss stated that he and Kenny located an unoccupied house and that Kenny told him to go to the rear of the house. Goss stated that he went to the rear of the house and heard noises that sounded like someone banging on a door where Kenny was at. Goss advised R.O. that it was not his idea to break into the house, but he was told by Kenny they were going to break into a house."

[4]Cheryl Porter testified, confirming that she had erased the tape under the circumstances testified to by Logan. She said she had been on the phone when Logan brought her the tape for transcribing. Another officer laid several tapes on top of Logan's tape and she erased the whole pile of tapes, including the tape given to her by Logan. Ms. Porter said the erasure of Logan's tape was not intentional.

Appellant also testified at the hearing on the *Hitch* motion, to establish the materiality of the lost tape. He testified that the statements attributed to him in Logan's supplemental report were inconsistent with what he actually told Logan.

After hearing the foregoing evidence, the trial court took the matter under submission and later ruled as follows: "It Is Hereby Ordered That Defendant's Motion to Suppress Pursuant to People vs Hitch Is Granted as to the Second Conversation With the Officer Which Was Taped, Said Tape Having Been Destroyed.

"The Court Will Not Suppress the First Conversation of the Defendant With the Officer Which Was Not Taped."

## Discussion

I. *The Hitch issue was properly preserved for appeal.*

After the court ruled on appellant's *Hitch* motion, appellant's counsel stated that he wanted to withdraw the motion at the commencement of the jury trial. He explained that he wanted to do this because the court's ruling that only the second statement would be suppressed left him in a worse position than if nothing had been suppressed. While the court's ruling allowed the officer to testify as to appellant's admissions, it precluded appellant from mentioning the destruction of the tape. Defense counsel stated that he wanted to withdraw the motion so the jury could hear evidence that the tape was erased by the sheriff's department, yet defense counsel stated that he also wanted to preserve the issue of the court's ruling on the *Hitch* motion for appeal. The court indicated it would allow defense counsel to withdraw the motion, but that this would have the effect of allowing evidence of the second statement and the loss of the tape to go before the jury without objection, thus creating a risk that the *Hitch* issue would not be preserved for appeal.

We need not reach the issue of whether defense counsel's actions resulted in a waiver of the *Hitch* issue, because the Attorney General concedes that the issue was preserved.[5] Penal Code, section 1259 supports such a concession.

---

[5]No unfairness would result from treating this issue on appeal because the *Hitch* motion afforded both parties opportunity to present evidence of the facts surrounding erasure of the tape (contrast *People v. Burciago* (1978) 81 Cal.App.3d 151, 169-170 [146 Cal.Rptr. 236]).

II. *The trial court erred by failing to suppress
evidence of both of appellant's statements.*

■ Appellant contends that the trial court erred by ruling that only
the second statement, which was tape recorded, had to be suppressed.
We agree, but find the error harmless.

All of Detective Logan's testimony concerning both statements
should have been suppressed pursuant to *People* v. *Hitch, supra,* 12
Cal.3d 641. The second statement was taken immediately after the
first, and the two statements were substantially similar.

The *Hitch* case set forth the following principles governing the loss or
destruction of evidence by law enforcement. The court first adopted a
standard for determining whether the evidence is sufficiently important
to require that it be preserved and made available to the defendant. The
*Hitch* court adopted a standard similar to that applicable when a defen-
dant seeks to discover the identity of a confidential informant. ■
The court held that evidence must be preserved and disclosed if "there
is a *reasonable possibility* that [it] would constitute favorable evidence
on the issue of guilt or innocence" (12 Cal.3d at p. 649, italics added).
The *Hitch* opinion then discussed the consequences of failure to pre-
serve such evidence.[6] The court held: "...[W]here...such evidence
cannot be disclosed because of its intentional but nonmalicious destruc-
tion by the investigative officials, sanctions shall in the future be
imposed for such nonpreservation and nondisclosure unless the prosecu-
tion can show that the governmental agencies involved have established,
enforced and attempted in good faith to adhere to rigorous and system-
atic procedures designed to preserve the test ampoule and its contents
and the reference ampoule used in such chemical test. The prosecution
shall bear the burden of demonstrating that such duty to preserve the
[evidence] has been fulfilled. If the prosecution meets its burden and
makes the required showing, then the *results* of the breathalyzer test
shall be admissible in evidence, even though the ampoules and their
contents have been lost. If the prosecution fails to meet its burden then
the court shall apply sanctions for nondisclosure. Finally we hold that in
such latter event due process shall not require a dismissal of the action
but shall require merely that the *results of the breathalyzer test be ex-
cluded from evidence." (Id.,* at pp. 652-653, fns. omitted; italics in
original.)

[6]The evidence at issue in *Hitch* was a test ampoule and its contents, which were the
product of a breathalyzer test administered to the defendant.

In discussing the appropriate sanctions, the *Hitch* court went on to state: "'If the evidence of the breathalyzer test is excluded, there is no reason why the People may not, if they desire, go forward with whatever other proof may be available.' [Quoting from *Van Halen* v. *Municipal Court* (1969) 3 Cal.App.3d 233, 238 (82 Cal.Rptr. 140).] Indeed the other proof may well be overwhelming. The material evidence provided by a preservation of the ampoules and their contents serves the function of possibly impeaching the test results. Therefore suppressing the test *results* should fully balance the improper failure to preserve the potentially impeaching evidence. It is noteworthy that where material evidence which would be of potential value in the impeachment of a prosecution witness has been improperly lost or destroyed by the government, federal decisions have indicated that the appropriate sanction to be imposed is the suppression of the witness' testimony. [Citations.]" (*Hitch, supra*, 12 Cal.3d at p. 654.)

The *Hitch* court also noted that "[t]he purpose of imposing sanctions on the prosecution where material evidence favorable to the defendant has been nonmaliciously lost or destroyed is of course to afford to the defendant to the fullest extent a fair trial." (*Ibid.*)

■ In reviewing the trial court's ruling on the *Hitch* motion, we apply the normal standard applicable in a section 1538.5 suppression motion to the extent the ruling is based on factual determinations. On appeal all presumptions favor the trial court's proper exercise of its power to judge credibility of witnesses, resolve conflicts in the evidence, weigh evidence and draw factual inferences, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence. (*People* v. *Superior Court* (*Keithley*) (1975) 13 Cal. 3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585]; see also *People* v. *Swearingen* (1978) 84 Cal.App.3d 570, 576 [148 Cal.Rptr. 755] (dis. opn. of Hanson, J.) which applied that standard in a *Hitch* suppression issue.)

In this case, the trial court imposed a sanction. Therefore, it must have concluded that the tape was material evidence under the standards set forth in *Hitch* and further concluded that the sheriff's department failed to establish and comply with rigorous and systematic procedures for the preservation of the tape. The evidence supports such findings.

■ First, as to materiality, there was a reasonable possibility that the tape could have impeached the officer's account of appellant's state-

ment to him.[7] Appellant testified at the hearing on the *Hitch* motion that he never made the incriminating statements about Kenny's plan to commit a burglary, which the officer claimed appellant had made in both statements. Appellant's denial of these admissions establish the tape's materiality. (Cf. *People* v. *Wright* (1976) 60 Cal.App.3d 6, 16 [131 Cal.Rptr. 311].)

The next question is the adequacy of law enforcement's efforts to preserve the tape. ■ Respondent contends the evidence established that the sheriff's department did have "reasonable procedures" for preserving tape-recorded statements and that the erasure of the tape here was inadvertent and only slightly negligent. The fact that the erasure may have been negligent rather than intentional does not preclude imposition of *Hitch* sanctions. In *People* v. *Swearingen, supra,* 84 Cal.App.3d 570, the appellate court rejected a contention that *Hitch* is inapplicable to negligent loss of evidence. The *Swearingen* court stated at page 574: "The Attorney General argues that *Hitch* is applicable only when there has been an intentional destruction of evidence by the police and not negligent loss of evidence. The argument fails. . . . [T]he *Hitch* rule exists to guarantee a defendant a fair trial through the preservation of evidence and not to punish police conduct. A fair trial is no less denied by negligent loss of evidence than it is by nonmalicious destruction."

In the present case, the prosecution did present evidence of the procedures employed in the sheriff's department to preserve tapes of defendants' statements. This evidence revealed that the tape was placed randomly on the secretary's desk for transcribing. The trial court may reasonably have concluded that tapes to be erased should have been segregated and clearly marked. Certainly, such a procedure is not inconsistent with the *Hitch* opinion. In that opinion the court used the words "rigorous and systematic procedures"—not the more lenient language ("reasonable procedures") adopted in the respondent's brief. (*Hitch, supra,* 12 Cal.3d at pp. 652-653.)

As noted by this court in *People* v. *Anderson* (1976) 59 Cal.App.3d 831 [131 Cal.Rptr. 104], *Hitch* established a "stringent" rule for the preservation of evidence (*id.* at p. 841). There is substantial evidence in this case to uphold the implied finding that the sheriff's department

---

[7]A showing of materiality is accomplished where the appellant demonstrates a "reasonable possibility" the evidence would be favorable on the issue of guilt or innocence. (See *Hitch, supra,* 12 Cal.3d at p. 649; see also *People* v. *Nation* (1980) 26 Cal.3d 169, 176 [161 Cal.Rptr. 299, 604 P.2d 1051].)

failed to undertake sufficient efforts to preserve the tape. Thus, imposition of some sanction was proper.

Turning to the propriety of the sanction adopted by the trial court, this court must proceed without much guidance from other reported decisions. ■ *Hitch* notes that the mode of sanctions depends upon the particular circumstances surrounding the destruction or loss of evidence (*Hitch, supra*, 12 Cal.3d at p. 650).

In the circumstances herein, the limited sanction imposed by the trial court still left appellant in the position of being confronted with evidence of his admissions, without having the benefit of the tape for impeachment. *Hitch* notes that "where material evidence which would be of potential value in the impeachment of a prosecution witness has been improperly lost or destroyed by the government, federal decisions have indicated that *the appropriate sanction to be imposed is the suppression of the witness' testimony. (United States* v. *Bryant* (1971) 448 F.2d 1182 [145 App.D.C. 259]; *United States* v. *Augello* (2d Cir. 1971) 451 F.2d 1167; Comment, *supra*, 39 U.Chi.L.Rev. 542, 561.)" (*People* v. *Hitch, supra*, 12 Cal.3d at p. 654, italics added.) This principle was restated in *Brown* v. *Municipal Court* (1978) 86 Cal.App.3d 357 [150 Cal.Rptr. 216] as follows: "Where potentially impeaching evidence on behalf of a defendant is suppressed [by law enforcement], due process does not require dismissal of the action, but only *exclusion of the prosecution's evidence which might have been impeached by the evidence suppressed*" (*id.*, at p. 363, italics added). ■ Since the missing tape might have had impeachment value as to Logan's testimony regarding both statements,[8] Logan should have been precluded from testifying as to either statement. Evidence of the first statement had to have been excluded in order to make the sanction of suppressing the second statement meaningful and effective. The suppression of only the second statement was of little, if any, benefit to appellant or detriment to the prosecution. It did little to balance the improper failure to preserve the potentially impeaching evidence.

We are not unmindful that the sanction the trial court imposed may have been an attempt to balance the hardships arising from the improper failure to preserve the potentially impeaching evidence. The sanction chosen by the trial court simply could not accomplish that objective.

---

[8] As noted *ante* at page 451, Logan said the two statements were substantially similar. The factfinder could reasonably infer that if Logan was incorrect as to the contents of the second statement, he was also incorrect as to the first.

The difficulty here is that the officers had no duty to tape record the first statement (see *People* v. *Miller* (1975) 52 Cal.App.3d 666, 669-670 [125 Cal.Rptr. 341]). Therefore, if the officers had simply stopped after receiving the first statement, rather than making and then losing a tape of the second statement, there would have been no problem with allowing Logan to testify as to the contents of the first statement. We recognize the argument that it would be an unusual extension of *Hitch* to exclude evidence of the first statement, which would have been admissible even if no tape had ever been made. A sanction excluding evidence of the first statement might appear to penalize the prosecution for making the tape. This is not our intent. We realize that the purpose of *Hitch* sanctions is *not* to punish police conduct, but merely to insure that the defendant receives a fair trial. (*People* v. *Swearingen, supra,* 84 Cal.App.3d 570, 574.)

In the unique circumstances of this case, we appreciate the difficulty faced by the trial court in attempting to reconcile the competing interests without either punishing the prosecution or depriving appellant of impeachment evidence. Suppression of both statements would have prevented the prosecution from introducing evidence (of the first statement) which would have been admissible, had no tape ever been made. This is a strong sanction. However, we believe it was impermissible to suppress only the second statement because this precluded appellant from informing the jury that a tape had been made and lost. That fact may have damaged Logan's credibility, particularly as to the statements he added in the supplemental report, after he knew it was no longer possible to verify the contents of appellant's admissions by resort to the tape. If appellant had accepted the questionable "benefit" of the trial court's *Hitch* ruling, his opportunity to impeach Logan's testimony would have been substantially impaired. However, appellant withdrew his *Hitch* motion before trial, and some evidence to impeach Logan did go before the jury. The jury heard evidence that a tape had been made and lost and that Logan's supplemental report differed from his first. Thus, Logan's testimony was in actuality not infused with a false aura of veracity.[9] The result is that the ruling on the *Hitch* motion, followed by withdrawal of the motion did not have the effect of depriving appellant of a fair trial.

---

[9]Defense counsel in closing argument to the jury did attempt to cast doubt on the officer's credibility. The following is an excerpt from his argument. "[W]hen there's been testimony about an oral confession you should look to that testimony with caution. [¶] And I think in this case you should look on that testimony with extreme caution, because here you don't have any report, any evidence of a confession until after the tape

 When evidence affecting the credibility of a witness is nonmaliciously lost or destroyed, the reviewing court need not reverse the conviction if the absence of the evidence (or in this case the presence of evidence which might have been impeached by the missing evidence) was "harmless beyond a reasonable doubt" (see *People* v. *Ruthford* (1975) 14 Cal.3d 399, 408-409 [121 Cal.Rptr. 261, 534 P.2d 1341], citing *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; see also *People* v. *Wright, supra*, 60 Cal.App.3d at p. 16).

 After considering all of the evidence, the practical effect of the ineffective sanction imposed by the trial court and appellant's position after withdrawing his *Hitch* motion, we conclude that any error in allowing evidence of the first statement without the tape to impeach it was harmless beyond a reasonable doubt. There was strong evidence of appellant's guilt and no viable defense. Appellant was virtually caught in the act of attempting to burglarize the unoccupied residence. Mr. Swanberg saw him behind the house near where the door had been pried open. A tire tool was found nearby and one such tool was missing from the car appellant was driving. There was evidence of consciousness of guilt, in that appellant attempted to flee from Swanberg, rather than remain there to clear up the situation. Moreover, there was evidence that appellant gave a false name (Carl Goss) at one point. Appellant's proffered explanation that he had run out of gas and was hoping to find some at the residence in question was highly unlikely to raise a reasonable doubt in the minds of the jurors for the following reasons. There was evidence that his car contained sufficient gasoline to start up on two occasions. Moreover, there were several houses with lights on between the place where appellant left his car and the house where he was supposedly seeking gasoline. Additionally, there was evidence that the house where appellant was found was obviously unoccupied. The total

---

was erased. [¶] Now, maybe Officer Logan is mistaken about what Donny told him. Maybe he really thinks that Donny said what is in his supplemental report. Officer Logan knew microwave ovens had been taken in the recent past in that area. Maybe he expected Donny to say that was why he was there. I don't know. [¶] But I do know that if we had the tape here I would play it for you. I would let you hear what Donny actually said. But through no fault of ours, we cannot do that. I think that if the tape still were in existence none of us would be here today because we would all know for sure, for absolute positive, that Donny did not say what Officer Logan says he said. But we do not have the tape here and I cannot play it for you. [¶] I have been very reluctant to say that Office [*sic*] Logan did not tell the truth here. I'll let you decide that. But, really, you don't have to decide that question. All you need to do is when you look at the evidence, if you have a reasonable doubt as to Donny's guilt, you must return a verdict of not guilty."

picture of the evidence against appellant was so strong that any *Hitch* error was harmless beyond a reasonable doubt.

### III. *The court properly imposed a probation condition requiring appellant to make restitution in the amount of $150.*

Appellant contends it was error to require him to make restitution in the amount of $150, because that amount represented the full cost of repairing the damage done to the house broken into. Appellant contends he should not have been required to pay for all the loss, because there was a confederate involved in the attempted burglary.[10]

Appellant relies on *People* v. *Kay* (1973) 36 Cal.App.3d 759 [111 Cal.Rptr. 894, 73 A.L.R.3d 1235], where the appellate court invalidated a restitution condition of probation. In *Kay* five persons were convicted of felony assault and felony battery in connection with a demonstration at a university hospital. The total amount of property damage was $40,356.97, and the trial court required each of the five convicted defendants to pay one-fifth of the losses. The appellate court held that such a probation condition could not stand. One of the reasons why the condition in *Kay* was invalid was that there were 123 demonstrators, and only 5 bore all the losses, which amounted to a substantial sum; 18 other defendants were convicted in municipal court of offenses arising from the demonstration and they were not required to pay anything by way of restitution. Moreover, the condition in *Kay* was not at all related to the acts (assaults) committed by the appellants, because there was no showing that the particular appellants in *Kay* had even been responsible for the property damage (*id.*, at pp. 762-763). Additionally, the trial court in *Kay* failed to consider whether the appellants were able to pay such a large amount (approximately $8,000 each) (*id.*, at p. 763).

The *Kay* court, in remanding, stated: "On remand, the judge will have information about the present resources of appellants and of their prospects. He will take into account the entire situation, including the responsibility of other guilty parties, not only those who were convicted

---

[10]Apparently, Kenneth Wayne Woods was also charged with the subject offense, but the record makes no mention of whether Woods was convicted of the attempted burglary.

in the municipal court, but also the total number of demonstrators, because apparently it is impossible to determine who among them was responsible for any particular damage to the property. We ought not spell out in more detail our conclusions but rather to leave the matter to the judge's good discretion." (*Ibid.*)

While the *Kay* opinion does indicate that the sentencing court imposing a restitution order should take into account the responsibility of other guilty parties, it does not establish rigid guidelines for apportionment, but merely requires the court to consider this factor in exercising its discretion.

In the present case, the total amount for which appellant was required to make restitution amounted to a much smaller figure than in *Kay*. And in this case, the restitution requirement clearly relates to the crime of which appellant was convicted. Appellant and his confederate should be jointly and severally liable for the full amount of the damage. This case does not present a restitution order totally unwarranted by the facts, as was the case in *Kay*.

■ The trial court has broad discretion in imposing conditions of probation. A condition of probation will generally not be invalidated unless it: "'(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality....'" (*People* v. *Lent* (1975) 15 Cal.3d 481, 486 [124 Cal. Rptr. 905, 541 P.2d 545], quoting from *People* v. *Dominguez* (1967) 256 Cal.App.2d 623, 627 [64 Cal.Rptr. 290].) The purposes of an order for restitution are rehabilitating the offender and deterring future criminal conduct (*People* v. *Richards* (1976) 17 Cal.3d 614, 620 [131 Cal.Rptr. 537, 552 P.2d 97]; *People* v. *Lent, supra*, 15 Cal.3d 481, 486). The *Lent* court observed that the restitution order need not be limited to the transactions or amounts of which the defendant is actually convicted (*ibid.*).

■ Since it could serve a rehabilitative purpose to require appellant to make the victim whole, and since the amount in question here was not great, we conclude there was no abuse of discretion in the trial court requiring appellant to pay for all the victim's losses. The fact that

another party was involved in the crime does not preclude the court from requiring full restitution by appellant. This was a valid condition of probation.

The judgment is affirmed.

Hopper, Acting P. J., and Pierson, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.