[Crim. No. 21560. First Dist., Div. One. Jan. 22, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE MARSHALL WILSON, Defendant and Appellant.

[Crim. No. 22274. First Dist., Div. One. Jan. 22, 1982.]

In re GEORGE MARSHALL WILSON on Habeas Corpus.

**COUNSEL**

Martin A. Kotler, under appointment by the Court of Appeal, and Kotler & Kotler for Defendant and Appellant and Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien and William D. Stein, Assistant Attorneys General, Robert R. Granucci and Michael Buzzell, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GRODIN, J.**—At 7 o'clock in the morning on Christmas Day, 1979, someone broke into Claire P.'s apartment, tied her hands and raped her, and left with her wallet and a tape recorder. After trial by jury, George Marshall Wilson was convicted of burglary, robbery, and rape for the offenses committed that day. The evidence against him was substantial: an envelope bearing his name and address was found among the bed-clothes; the wallet and tape recorder were found in Wilson's apartment; and Ms. P. identified him from a lineup as her assailant.

Wilson's sole contention on appeal, reiterated in a petition for habeas corpus, is that he was deprived of the competent assistance of counsel in violation of his rights under the Sixth Amendment to the federal Con-

stitution and article I, section 15 of this state's Constitution. This contention is based upon the following facts, as reflected in the trial record and in the record developed pursuant to this court's order to show cause on the habeas petition.

On the morning of the attack, Ms. P. was taken to the county hospital, where she was examined and a blood sample and two vaginal swabs were obtained. On Tuesday, March 18, the day before trial, the prosecutor requested a court order for a blood sample to be taken from the defendant, and the order was granted over defense counsel objection. At trial, Ms. Gibbons, an expert in forensic serology, testified she had examined the two vaginal swabs and selected one of the swabs for further examination. On this swab she detected intact spermatozoa, and an aggravated level of acid phosphatase which confirmed the presence of semen. She was unable, however, to demonstrate the presence of enzymes on the swabs. She testified, in that connection, that from the acid phosphatase assay she was able to calculate that the swab contained "about 1.3 micro liters of semen," and that this was a "borderline level" for determining the existence of the enzyme PGM (phosphoglucomutase). She therefore did not conduct any tests of Wilson's blood as to enzyme groups. Wilson's blood type (type O in the ABO system) was the same as Ms. P's, a fact which gives rise to relevant inference.

Wilson contends that his counsel was at fault for failing to have the semen sample analyzed to determine the presence of various genetic markers, including peptidase A, which he alleges is particularly useful in determining the identity of a semen donor when a black individual is the suspect, as well as PGI (phosphoglucose isomerase) and PGM. He asserts, on information and belief, that .04 microliters of semen is sufficient to determine the presence of peptidase A, .01 (*sic*) microliters to determine the presence of PGI, and .10 microliters (*sic*) to determine the presence of PGM.

In support of this assertion, Wilson cites in his appellate brief an article on genetic markers (Blake & Sensabaugh, *Genetic Markers in Human Semen. II: Quantitation of Polymorphic Proteins* (1978) 23 J.For.Sci. 717) which contains a table of estimates for the minimum volume (in microliters) of *whole semen* required for routine electrophoretic typing of fifteen different genetic markers, including peptidase A (.04), PGI (.1), and PGM (1.0). (*Id.*, at p. 726, table 5.) In addition, he submits in connection with the habeas corpus proceeding a declaration from a criminalist/forensic scientist, who observes that Ms. Gibbons in

her testimony made no mention of attempt to perform peptidase A typing, which he asserts "can distinguish between Black males approximately 25% of the time" (that is, if two black males are picked at random, there is a 25 percent chance that they will have different peptidase A types). The declaration states that "Peptidase A can be performed on as little as .04 micro-liters of semen. Therefore, the 1.3 micro-liters that was available ... may have been sufficient, assuming the sample had not degraded, and should have been tested."

In *People* v. *Nation* (1980) 26 Cal.3d 169 [161 Cal.Rptr. 299, 604 P.2d 1051], the Supreme Court recognized that semen analysis may, in certain cases, completely exonerate a defendant, and it held that "when a woman has been the victim of an attempted or actual rape and the police recover a semen sample of the assailant, the authorities must take reasonable measures to adequately preserve this evidence." (*Id.*, at p. 177.) Wilson argues that "evidence favorable to an accused is no less 'lost' whether it is destroyed by the authorities ... or unavailable because defense counsel failed to take the proper steps to have experts analyze it." Invoking *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal. Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1], Wilson insists that his trial counsel, by failing to explore this potential defense, failed in his "duty to investigate carefully all defenses of fact and of law that may be available to the defendant," and that this failure "result[ed] in the withdrawal of a crucial or potentially meritorious defense." (*Id.*, at p. 425.)

Wilson's showing is, in our judgment, too limited and conjectural to support a conclusion that he was deprived of competent counsel, or to require further evidentiary hearing. We have no declaration from trial counsel, so we do not know, except on the basis of rather indirect inference from record statements, what facts he knew or what inquiry he may have made.[1]

---

[1]After defense counsel voiced his opposition to the motion for an order permitting a blood sample, the prosecutor observed that "the analysis of the defendant's blood can do only two things: it can say he belongs to a class of people who is the same as the semen donor in this case, which doesn't say that he is actually the one. On the negative side, however, the test can definitely exclude the defendant." Defense counsel then asked, "What did you say about the type secretor?" The prosecutor responded, "The semen donor is a secretor, the victim is a nonsecretor." Defense counsel said, "But there's a blood type consistent with that sample, is that right?" The prosecutor replied, "No, no. If the blood is analyzed it can say the defendant's blood is consistent with the class of person who donated the semen on the vaginal swab. But that's one reason why the criminalist much prefers to do the analysis of the semen sample prior to the [defendant's] blood. ... If [the victim and the semen donor] are both secretors, you don't know anything. It can be her own chemistry reaction."

Moreover, we have no factual support for the proposition that reasonably competent counsel, under the circumstances of this case, would have done what Wilson says his trial counsel should have done. Routine genetic typing of semen from postcoital vaginal swabs appears to be a relatively recent phenomenon in forensic science.[2] The Supreme Court in *People v. Nation, supra,* 26 Cal.3d 169, recognized "While there are many possible analyses that may be performed on semen to identify the donor,...the two analyses deemed most commonly feasible are ABO blood typing and identification of the genetic marker phosphoglucomutase (PGM)." (*Id.,* at p. 176.) The Supreme Court did not mention peptidase A, which constitutes the principal focus of Wilson's appellate attack. While it may be that reasonable inquiry by Wilson's trial counsel would have led him to peptidase A, that is by no means apparent on this record.

Finally, even on the assumption that Wilson's trial counsel acted in an incompetent manner, the record does not support the conclusion that Wilson was thereby deprived of a potentially meritorious defense. Of course, as Wilson observes, *People v. Pope, supra,* 23 Cal.3d 412, does not require a showing of assured success. We could not expect Wilson to demonstrate that the peptidase A test, if performed, would have exonerated him. But we can expect him to go as far as he reasonably can in excluding other contingencies. What we have is a declaration to the effect that the amount of semen present "may have been sufficient" to test for peptidase A, with no consideration or explanation of the factors which might have bearing upon the degree of probability that this would be so.[3]

[2]As recently as 1975, the authors of an article published in the official journal of the British Academy of Forensic Sciences concluded, on the basis of their experiments, "there are great difficulties associated with the PGM typing of semen on post-coital swabs" and that "present results would indicate that the application of these techniques to individualize seminal PGM on post-coital vaginal swabs is unwise." (Rees & Rothwell, *The Identification of Phosphoglucomutase Isoenzymes in Semen Stains and its Use in Forensic Casework Investigation* (1975) 15 Med.Sci. Law 284, 292-293.) The following year, the authors of an article published in the official journal of the California Association of Criminalists concluded that seminal PGM from postcoital vaginal swabs could be accurately typed, provided certain guidelines were followed. (Price et al., *The Typing of Phosphoglucomutase in Vaginal Material and Semen* (1976) 16 J. Forens. Sci. Soc. 29, 41-42.)

[3]We observe that Blake and Sensabaugh, in the study upon which Wilson and his expert rely, used neat semen obtained from volunteers by masturbation, liquified at room temperature for 30 minutes, and then treated or stored at low temperatures. (Blake & Sensabaugh, *op. cit. supra,* 23 J.For.Sci. at p. 718.) The samples in the case at bar were obtained by vaginal swabbing some time after the rape. The literature indicates that protein degradation and loss of enzyme activity probably occurred in the interim.

The conviction is affirmed; the order to show cause is discharged and the petition for writ of habeas corpus is denied.

Racanelli, P. J., and Elkington, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 7, 1982.

---

(See Blake & Sensabaugh, *Genetic Markers in Human Semen: A Review* (1976) 21 J.For.Sci. 784, 794-795.) The literature also suggests the possibility of other variables. (See Sensabaugh, Blake & Northey, *Genetic Markers in Semen. III: Alteration of Phosphoglucomutase Isozyme Patterns in Semen Contaminated with Saliva* (1980) 25 J.For.Sci. 470.)